The next matter on our calendar is Federal Trade Commission and New York v. Quincy Bioscience. Thank you. Thanks. I love this, it's working again. So you can thank him. Thank you. Good morning, counsel. Good morning, your honors. I'm Brad Grossman for the Federal Trade Commission. May it please the court. In its national TV and internet advertising campaign, Quincy Bioscience told consumers without qualification that Prevagen improves memory within 90 days and that these effects are clinically proven. The complaint sets out detailed facts that, when taken as true, plausibly show that the ads were false and misleading on several distinct levels, any one of which was enough to defeat the motion to dismiss. First, the complaint alleges that Quincy made unqualified across the board claims that Prevagen is proven to improve memory when its own clinical trial showed no statistically significant difference between the people who took Prevagen and those who took placebo on nine separate tasks. Counsel, you seem to be, the FTC, seems to be concerned about the subgroups. Could you explain why? Because they break out data for subgroups that supports the very claims that you just mentioned. Sure, your honor. The complaint in paragraph 29 specifies several reasons why, in totality, a fact finder could determine that those subgroup results were unreliable. The first is that the study as a whole failed, which creates a competing inference on its own that the product doesn't improve memory. But there are several additional facts, your honor. Failed in that there was no difference between the placebo group and the Prevagen group? Correct. Correct. When Quincy conducted the 218-person double-blind trial that it advertised in its ads, that 218-person trial found no statistically significant differences. I submit, your honors, that that alone creates at least a plausible inference that the product doesn't improve memory. And under this court's precedent, all we need to demonstrate is a plausible inference, not necessarily the most plausible inference. But, your honor, paragraph 29 of the complaint goes way further than that. Paragraph 29 of the complaint provides four additional reasons why that subgroup analysis could not be reliable evidence of a treatment effect, or at least that this is a question for experts. Because, your honor, the legal standard is what experts in the relevant field would decide. So one of the reasons is that paragraph 29 explains that the subgroup members only had statistically significant improvement, or I shouldn't even say improvement because that's the issue in the case, statistically significant differences on isolated tasks. Does the record show how large those subgroups were? How many people fell into those two little pods? The complaint does not make such allegations. Quincy submitted evidence outside the complaint that states that 100 out of 211 study participants belong to those subgroups. But, your honors, Quincy advertised that the entire Prevagen arm of the study showed improved memory. And as we explain in our reply brief, even if this court were to consider that outside evidence, that outside evidence would lead to an inference that these claims are not just misleading, but literally false. But, if your honors, I'd like to turn to several additional reasons that the complaint in paragraph 29 provides, showing that there's at least an inference that these subgroup analyses were unreliable. Another reason is that the analyses were performed post hoc, which means that after the experimenters discovered that the 218 person trial failed as a whole, they then performed over 30 different analyses looking for a positive result. What's the matter with that? Tell me what's wrong with that. The vast majority of those results turned out negative, your honor. Quincy made full-throttled advertising campaigns based on a few positive results, overlooking the vast majority of the results of its trial, proclaiming that a gold standard clinical trial proved improved memory, while overlooking the fact that the vast preponderance of the data were negative. Cherry-picking an X in the C of O's. Exactly. Cherry-picking, your honors. Couldn't have said it better. But, in addition to that, there are two further reasons I'd like to explain why these subgroup analyses weren't reliable. The first is the sheer number of data points analyzed. So, as paragraph 29 explains, Quincy performed over 30 different analyses, looking at different variations connecting subgroups to results. And, as the complaint explains, whenever you conduct an additional statistical test, your honor, commensurate with that is that the odds of finding some kind of outlier in the data increase, and that's what the complaint alleges. But, there's a final reason. I'm sorry, your honor. Subgroups, they're not testing a hypothesis that they state in advance. Correct. That's why, that's the key term, post hoc. And, you know, in fifth grade science class, I was taught, when you conduct a scientific experiment, you're supposed to specify your hypothesis in advance. Then, you test your hypothesis. With a subgroup analysis, what exists is you find data, you're searching the data for a hypothesis. And, maybe, Quincy could, later on in time, retest that hypothesis and seek confirmation. But, your honors, this is entirely a question for experts. But, if I may, there's one. Could you comment on, I mean, the district court looked at this clinical trial synopsis. Yes. Apparently, it was prepared by Quincy itself. This wasn't published in a peer-reviewed journal. Yes. It was prepared by an employee of Quincy. Correct. On the eve of this litigation, it was. And, it prepares, and it would be one thing, your honors. Did you have an opportunity to present substantiating expert documents, for example, about the validity of the statistical analysis? Correct. But, we would do that at summary judgment. You did not at this point, because you were on 12B-6. We were on 12B-6. And, we explicitly told the court, in, I think, four different places, this is only the time to weigh the complaint on its face. What happened here? It appears to me, your honors, that the judge credited extensive evidence outside of the scope of the complaint. Why? I can only speculate. I don't know. But, one of the things that happened here. Probably, when this Quincy synopsis came up, there was a big dispute about it, right? In response to the motion. There was a dispute about it? What we disputed, your honors, was that the court should not weigh outside evidence, should not weigh evidence. The validity of evidence, or the validity of the subgroup analyses. And, that objection subsumed an objection to this outside evidence. But, I submit, your honors, Rule 12D was crafted for this very situation. Under federal rule of civil procedure. My question, in asking what happened here, you know, it's not the usual course that a district court judge will just take a synopsis that's created post hoc, or a month before a complaint is filed, and in the context of a 12B6 motion, say I'm going to review this synopsis without giving the other side a chance. So, what happened? I think that the judge violated federal rule of civil procedure 12D. That's what happened. Were you, did you tell him that it was a 12D problem? Did you have an opportunity? Well, we didn't have an opportunity. The judge didn't hold a hearing in this case. And, what we said on the face of our papers. Is there a motion for reconsideration? We did not file a motion for reconsideration. We appealed directly. Because we thought that the problem was sufficiently weighty that the court had already opened that door. By considering evidence outside of the complaint, the court was required by this court's precedent to convert the proceedings to a motion for summary judgment. And that didn't happen. And we were. You made a tactical decision to appeal as opposed to move to reconsider. Well, we feared that the motion to reconsider would be futile. And this is a case, your honors, in which there's deception, there's pervasive deception on the national airwaves. And we feared, your honors, that this would only add that if a motion to reconsider when the judge has already opened the door. By considering not just the synopsis, but an NIH study to make a finding that subgroup research is common in the dietary supplement field. We determined that once the judge opened that door, it was just going to lead to months of additional delay. And that wouldn't be the right thing to do for consumers. So, that's why we took this case up on appeal. If I may, there was one additional reason why the subgroup analyses are unreliable. As we allege in paragraph 31 of our complaint, the entire theory behind this product, Prevagen, was that it operated as a brain protein supplement. The theory behind this product was that your brain proteins decrease with age and that that somehow causes diminished memory. And that the product, the jellyfish protein, would make it to your brain and supplement brain protein. The complaint- To the human brain. To the human brain. And the complaint allegations, which the court has to take as true, state that Quincy's own safety studies showed that the entire theory behind the product was false because they knew from their own clinical research that the dietary protein is digested and broken down in the stomach no better than any type of food we eat. So, from that alone, a fact finder could infer in totality, also considering the failed subgroup results and the tiny number of significant results, could say, this doesn't look like credible evidence. But I don't want to get ahead of ourselves here. I mean, this is 12B6. Can I ask another question? Sure, your honor. Part of what I understand to be your opponent's argument is that you're the FTC, but you're really holding them to an FDA kind of standard. And this is a supplement that shouldn't be treated like a drug by requiring a randomized controlled double-blind clinical trial in two publications, or however many publications, you're holding them to an undue standard. What's your response to that? I have several responses. First, between our briefing and that of a Meeki public citizen, there are four FDA commentaries casting doubt on the reliability of subgroup analyses. In addition, the claim here isn't that Quincy was committing deception by virtue of not conducting sufficiently rigorous studies. Here, the allegation is that Quincy opened that door. It performed a randomized clinical trial. Your honors, performing a randomized clinical trial does not give an advertiser carte blanche to misrepresent the results of that trial. You're focusing on the fact that they were advertising, saying our claims are substantiated by the gold standard. Correct, and when the gold standard trial, in this case, your honors, actually provides important evidence why the product does not work. And if you look at- It's the basis for the false advertisement claim. Pardon me, your honor? It's the basis for the claim. It's the underlying clinical. Exactly, there are two bases here. One is that Quincy made very broad advertising claims that wouldn't even be substantiated by the subgroup results, even if they were true. And the second theory of the case is that the subgroup results in and of themselves are unreliable in this case. But I submit, again, this is just a motion to dismiss. The legal standard in this case depends on the views of the scientific community. And when the district court made this decision, he said he shut the door on hearing from experts, crediting outside documents that basically credited Quincy's outside experts, whoever wrote that synopsis, as true, and then made inferences that controverted the allegations of the complaint. And that, under this court's holding in global network communications and many other cases, it simply cannot stand. I want to go back to the dead. Back to the dead? I mean, back to a judge who seems to be, to just stand, who seems to be very receptive to Quincy's arguments. Well, we're looking for a remand which will allow us to develop our case, to take discovery, and on a motion for summary judgment to provide an opportunity to fully rebut this extrinsic evidence that Quincy relied on in its papers. We simply, we expected the district court to make this decision based on the facial validity of the complaint. And he didn't do that. If we get that opportunity on remand, we will absolutely have a chance to make that case, and I'm confident that we will. Thank you, Counsel. You're reserved three minutes for rebuttal. Thank you, Your Honors. State of New York first. Morning, Your Honors, and may it please the court. Scott Isman for New York State. The district court erred in dismissing the complaint's FTC Act claims, and because the complaint's state law claims cover at least the same conduct as those federal claims, this court should reinstate the state law claims after reversing the dismissal of the federal claims. Now, the complaint pleads a classic case of deception and false advertising under the FTC Act. Quincy repeatedly advertised, and this is one example from Quincy's website, that in a computer assessed, double-blinded, placebo-controlled study, Prevagen improved memory for most subjects within 90 days, and that Prevagen works by providing protein originally found in jellyfish that our brains need for healthy function, but is diminished in the aging process. First claim that it affects most participants was not correct. That is simply false, Your Honor, and is contradicted, as we allege in our complaint, by the double-blind, placebo-controlled study that showed no statistically significant results for the Prevagen group as compared with the placebo. Some of the amicus are worried that if we talk about the double-blind study, we're raising the ante on supplements, which don't require double-blind gold standard studies. But your argument is, if they mention it, then it has to meet a certain scientific validity. Is that correct? Well, our claim is that if they mention it, they need to accurately represent it. It has to be true. Precisely, Your Honor, and instead, they represented the exact opposite of what the study showed. But you're not arguing that all supplements that advertise require this double-blind gold standard study. That is not our argument, and that is not what we allege. Some of the amicus were worried that, should we find in your favor, that that's what we would be devolving on to. And I don't think that this court needs to go there, Your Honor. This court could hold that the complaint here plausibly alleges that when an advertiser represents that it conducted a double-blind, placebo-controlled study that found a result, that study must have actually found that result and not the opposite of that result. And the second part of the advertisement that we say is false or misleading or deceptive is that the jellyfish protein, apicorin, can cross the human blood-brain barrier. And, in fact, again, Quincy's own studies contradicted that claim. In fact, their studies show that apicorin is digested in the human stomach and broken down into amino acids like any other protein, and thus does not cross the human blood-brain barrier. This is part of the efficacy claim, yes, Your Honor, and it- The way that I view this is false proof claim and efficacy claim, is that- That's right, there's establishment and efficacy, and the efficacy claim is that the drug, or sorry, the supplement works as advertised, and the establishment claim is the clinically shown means that it was actually clinically shown to do so. And so for those reasons, the complaint adequately states an FTC Act claim and adequately states a state law claim as well, and because New York courts consistently look to the FTC Act and to federal court decisions on the FTC Act and specifically on sections 5 and 12 when construing the state law claims alleged here, under GBL 349 and 350, and under executive law section 6312. There's no need to remand for consideration of those state law claims, and as this court did, for instance, in the Herman case, where it reversed the dismissal substantively of the federal claims, and then reinstated state law claims that were dismissed for lack of supplemental jurisdiction. If I can just touch on one last point, Your Honor. Your view is that it was not really about lack of supplemental jurisdiction so much as he would have done the same exact thing on the merits of the 12B6, 12D, I guess really 12B6 motion. Yes, Your Honor, sustaining the state law claims here follows ineluctably from sustaining the federal law claims. And just one last point I wanted to make in response to the individual defendant's arguments about personal jurisdiction. This court has squarely held, as recently as 2018 in the Charles Schwab case, that there is pendant personal jurisdiction over state law claims when a complaint alleges state law claims that arise from a common nucleus of operative fact with a federal claim that allows for nationwide service of process like the FTC Act here, so without even having to go to New York's long arm statute, which independently would provide for personal jurisdiction over the individual defendants, this court can hold that the individual defendants were properly subject to suit in New York. Thank you. Thank you, Your Honors. We'll hear from Bioscience Council. Your Honors, may it please the court, Jeffrey Jacobson for Quincy Biosciences. Judge Loyer, I want to start with your question. Judge Stanton got this exactly right. And the answer to your question about why did he consider the synopsis, it's because the FTC didn't tell him not to. You can read their brief to the district court. They didn't cite Rule 12D, they didn't object to our inclusion of that synopsis, they argued from the synopsis. All the synopsis did was include data. They have the same data. They investigated us for a year. Nonetheless, was it proper for the district court to make factual findings about the subgroups based on the synopsis? Judge Carney, he did not make any factual findings based on the subgroups. Let me back up a minute. Prevagen is a dietary supplement for mild, mild memory problems associated with aging. That's what it's advertised as being. Mild memory problems associated with aging. We conduct the medicine. The medicine study was covered not just people with mild. Well, so that's exactly where I was going, Judge Carney. So the Madison Memory Study screened people on the way in. So this was not an X and a C of Os. This was a hypothesis in advance. Screened people on the way in. What is your level of impairment now? That's the 88 screening tool. So within the 211 participants who completed the study, 100 of those participants were 88, 0, 1, or 2, meaning they had normal functions or mild cognitive impairment. So there was effectively a study within the study. The 8802 subgroup, 100 people. And then other people who came into the study with more severe impairment at the beginning of the study. We don't dispute that if you look across the entire 211 people who completed the study, there was no statistically significant difference. But- You couldn't dispute that. And I'm not. But for the 100 people who had normal cognitive function or mild memory problems associated with aging, there was a statistically significant difference on three of the tasks. And if you look at all of the tasks, and it's all in the record, and they didn't dispute any of this in the district court. Six of the tasks, the Prevagen group did better. Only in three was it statistically significant. Their theory to the district court had nothing to do with what our advertisements were. This is all a brand new theory to this court. Below, it's all in paragraph 29. We all agree that we were looking at paragraph 29. That's what Judge Stanton focused on. And what paragraph 29 of the complaint says is subgroup analysis is inherently unreliable. There is no attack in paragraph 29 on us specifically, other than that we conducted, they say, 30 analyses. They don't- I'm sorry, Your Honor? Where does it say that? Paragraph 29. I've got it right here. After failing to find a treatment effect for the sample as a whole, the researchers conducted more than 30 post hoc analyses of the results, looking at data broken down by several variations of smaller subgroups. And then they say this methodology greatly increases the probability that some statistically significant differences would occur by chance alone. That's their complaint. The use of subgroups- In paragraph 28 at the bottom, it says the Madison Memory Study failed to show a statistically significant improvement in the treatment group over the placebo group on any of the nine tasks. That's looking at the whole- For the people who had more severe cognitive impairment. So again, we are advertising based on the subgroup results. There's no dispute about that. We're advertising based on the subgroup results of people who had normal cognitive function to mild impairment. The hundred people in the subgroup. And for them, we have evidence. We have gold standard evidence. And that's what we're advertising based on. And again, their complaint is that we can't advertise based on subgroup analyses at all because other people who had more severe impairment, we didn't have the same statistical evidence. You don't specify that it's a subgroup of the entire study in the ads. But we're advertising to people for mild- Again, if you read the state's brief, they're suggesting that consumers might think that we're advertising a cure for Alzheimer's. Number one, we're not advertising a cure for Alzheimer's. We make the disclaimer that we're not advertising to prevent any disease. We're also advertising for mild memory problems associated with aging. We're not advertising a cure for all memory problems for any purpose. So what we're advertising is a supplement for mild memory problems associated with aging. And we have 100 people for whom we have that backup. And are you saying that was not a post hoc analysis? That that was part of the hypothesis going in that was, and the study was designed around that? So your honor, that would be a fact that would, that the FTC would dispute because they're talking, look. Are you saying it was not a post hoc analysis? What I'm saying is that we screened on the, there's no dispute that we screened on the 88 scale on the way into the study. So we were asking people what their level of impairment was on the way in. The study wasn't designed around that premise though, right? I mean, we're looking at all 200. The study was designed to find out whether Prevagen improves memory for people at varying levels of impairment. So again, we don't dispute that we don't have the evidence for people who had more severe impairment coming in. But for a supplement that we're advertising for mild memory problems associated with aging, we have exactly the support. Okay, bear in mind that none of us are scientists as background to this question. Could you discuss the fact that the drug, that Prevagen, seems to dissolve in the stomach and does never cross the brain blood barrier? So first, your honor, it's not a drug, it's a supplement, and that's an important distinction. But, so here, the FTC and the state alleged two things. First, they alleged that we advertised that we have proof that it crosses the human blood brain barrier. You say you have proof that it improves memory. Well, we do, but- And you talk about brain proteins. Well, but again, it breaks down into peptides, and the question is, but two points, your honor. First of all, we are advertising, and this is in paragraph 31 of the complaint, and if you look on page 13 of their complaint, where they're citing what we say, we say, our advertising, from their complaint, when cerebrospinal fluid and blood plasma samples were taken from a population of dogs, dogs, to which apoquarin was orally administered, these samples showed quantifiable evidence that the supplement was present in the nervous and circulatory systems of the animals. So A, we're advertising based on studies we've performed of dogs, where we've analyzed their cerebrospinal fluid and found apoquarin in the cerebrospinal fluid. And on that basis, we believe that the active ingredient does cross the blood brain barrier, but we're very careful to say- Do your ads make that clear, that that was not based on human studies? This is from the ad. This is a quote from the ad, talking about dogs. So it does say dogs. It does say dogs. We never say human. But on the contrary, you know that it doesn't cross- No, your honor, their allegation is that our safety studies show that it's tolerated. But it's completely dissolved in the stomach. We don't agree that that's what our studies show. That's what they've alleged, but they provide no support for it in the complaint. So don't you think this is the kind of thing that would benefit from discovery? Except, your honor, see that's what Judge Stanton's footnote, which they criticize, actually got it exactly right. Because their allegation is not that we shouldn't be advertising the ability of the product to cross the blood brain barrier. Because number one, we have the dog study that shows that it can. But number two, their allegation is that the product can't work. That it's gotta be snake oil, it can't possibly work because it's broken down in the stomach. And Judge Stanton said with regard to that allegation, there are actually two reasons why that's not plausible. First, we have the dog study, which they're quoting from in the complaint, which shows that it does get to the brain. But more importantly, we have the Madison Memory Study, which is evidence that we're advertising on that the product works and is effective for mild memory problems associated with aging. And because in post hoc studies in a small subgroup of participants, you found some statistically significant. I mean, I'm just saying this to point out that these are things that one might debate and that one could usefully receive expert testimony. And all of the materials that they cited for the first time to this court, they could have amended their complaint. They didn't do it. Now, I would argue they didn't do it because- The complaint to include expert affidavits and so on. Not expert affidavits, but they cited, for example, they put two studies before this court. That they say criticize use of subgroup analysis. I've read what they cited. It doesn't say that. But again, why isn't this more appropriate for determination on summary judgment then? Because their theory on their complaint, Your Honor, was that subgroup analysis is inherently flawed. That it can never be used, which is simply not- I just don't, so I asked you to read or cite for me somewhere in the complaint that really crystallizes that theory. And I don't see it. Well, Your Honor, I would say two things. First of all, paragraph 29- I'm reading. Right, but so- And I'm rereading. This methodology greatly increases the probability that some statistically significant differences would occur by chance alone. And if you look at the state's brief, Your Honor, on page 27 of their brief, they argue that any use of subgroup analysis is inherently flawed. The FTC tries to argue, on page 34 of their brief and on pages 2 and 12 of their reply, they try to argue that they made a specific attack on our use, but there's nothing in the complaint. And what Judge Stanton said was, if you've got more, tell me what it is. But what you're arguing is that subgroup analysis is never appropriate and you never get beyond the theoretical. Because you pick your own data. That's why subgroup analysis is inherently unreliable. Because you have a whole field of data and you pick out the one or two or three points. Well, Your Honor, first of all, it's not one or two or three points. It's a hundred participants in a study. It's a study within a study with a hundred participants in it. And massively positive results. Not Judge Lohier, one X and a C of O's, but tremendously positive results in multiple tasks. And you would expect- Three out of how many tests? Three out of nine with statistical significance. Three more where it was improvement but not statistically significant. And three others where it was a tie. So again, their theory is that if you're engaged in subgroup analysis, you would expect noise and you would expect the placebo group to do better. The placebo group never did better. The Prevagen group did better on six of the nine tasks and three were a tie. And so again- Were those tasks memory tasks? Yes. Or were they executive functioning? Well, it's the cog state battery of- They were not all memory tests, though. Correct. Correct. It's a battery of tests associated with different functions of- But they were not all memory tests. That's correct, Your Honor. But again, all Judge Stanton said was, if you're making a theoretical attack on subgroup analysis, the FTC just requires competent, reliable scientific evidence. They've never even required a gold standard study. We have one. We have a study within a study of this subgroup. It's not a small subgroup, Your Honor. It's not cherry-picked data. It's the most significant subgroup people screened on the way in for these criteria. Health screened, right? Well, sure. But they're telling us what their memory problems were on the way in. There's no reason why they would- Right, but you didn't test them before you gave them the drugs. Well, no, but we do, and this is in the record- Supplement, excuse me. But this is in the record as well, that their baseline, when they were screened for baseline given the Cogstate tests, the people who received Prevagen and the people who received placebo were scoring the same on the baseline tests. So unlike, for example, the Palm Wonderful case, where the FTC made a specific attack on a study that was used by Palm Wonderful, where they said it's too small of a sample, and they said that the people who were taking the supplement started with better values than the people who weren't taking the supplement. Here, there's just nothing in the complaint that's a specific attack on our use other than the number 30, which they don't explain, and the fact that they use the term post hoc, and I would argue that post hoc is an inappropriate term to use when we screen for this on the way into the study. Are we not supposed to take this complaint at face value? And I take it that what you're saying is just standing one and more factual elaboration. Correct. And I- It's not enough to just say this methodology greatly increases the probability. And Judge Loyer, I would challenge you, Judge Loyer, to find an example in Judge Stanton's opinion where he found a fact. The FTC is criticizing a highly respected district judge and suggesting, and your Honor expressed incredulity about this, rightly so, how in the world could he have gotten this so wrong? And the answer is he didn't. He looked at the complaint, he looked at their brief, which was, they didn't make any of the arguments they're making to you. They just said, hey, we cited all of their advertisements. We allege that subgroup analysis is no good, and we should be able to get to the summary judgment stage. And Judge Stanton said, no- Judge Stanton, his opinion, writes that the results of the subgroup study make it clear that something caused a statistically significant difference between those subjects who took Prevagen and those given a placebo. That's footnote three, Your Honor, and what- How should we understand that? I mean, that's not a typical- That is an infelicitous footnote, I will grant you. But what Judge Stanton, when Judge Stanton wrote that, he was talking about their argument about the blood-brain barrier. And again, he was addressing their specific argument that the product can't work. And so he said, if they're going to argue that it can't work, because it can't possibly get into the blood-brain barrier, again, he's citing the two points of evidence, he's saying the dog studies- Because I read the complaint, it said that there was no evidence that the substance crossed the blood-brain barrier. Again, Your Honor, your conflate- I mean, I get it, but there's two different arguments here. The first is, did we ever say we have evidence that it crosses the human blood-brain barrier? No. We only say we have evidence that it crosses the blood-brain barrier in the dog studies. But the thrust of all the advertising is still that this is why it works, because- I don't- Because they're going to get to your brain cells. I don't accept that, Your Honor, but even if that were true, even if we were saying that it works because the entire apiquorin chain of proteins gets intact to the brain, which we never said, but even if we did, what Judge Stanton is saying in that footnote is, number one, that is true for the dog. We have evidence that it does get intact into the cerebrospinal fluid, and we have evidence of that from the canine studies. But what he's saying is, if their argument is that the product can't work, they've got to wrestle both with the canine studies, which shows that it does cross the blood-brain barrier in dogs, and they've got to wrestle with the Madison Memory Study results, which show that it worked. Which showed a statistically significant result in some small subgroups on certain limited tests. Your Honor, I must protest the court's continued adoption of the FTC's terminology of the word small. This is not a small subgroup. If we had a separate study with 100 people in it, the FTC would be the first to admit that a 100 person, gold standard, randomized study is more than sufficient. We did a study of 211 people, of which 100 had mild memory problems, and that entire subgroup had massively positive results. Thank you. Thank you, Your Honor. We'll hear on behalf of the two individuals, Underwood and Beeman. Judge Pooler, and may it please the court. I'm actually going to cede some of my time back to Mr. Jacobson, because I think he had some additional points to make. But I just briefly want to raise one of the arguments that we have in the brief on behalf of the individual appellees. And that has to do with what my friend has called the nationwide service provision in the FTC Act. Section 13B of the FTC Act does not grant nationwide service unless the venue clause is also met. So there are two separate operative provisions of that portion of 13B. One is the venue provision, which says venue is appropriate where a company does business. Actually, one second. Any suit may be brought where such person, partnership, or corporation resides or transacts business or wherever venue is otherwise appropriate under 1391. That's the venue clause. At the end of that paragraph, there's a middle clause, which is an in the interest of justice clause, which is you can add other people if you can't put them all together in one venue. The last clause of that same paragraph says, in any suit under this section, process may be served on any person, partnership, or corporation wherever it may be found. That process provision, that process clause, has to relate back to the venue clause. And to read it separately, we contend is nonsensical. This court reached the exact same conclusion in the Daniel versus American Board case, which dealt with a very similar venue and process provision in the Clayton Act. So we just want to highlight that argument for the court. But I'll see the rest of my time to Mr. Jacobson. Thank you very much. Thank you. Mr. Jacobson, you have three more minutes. I thank you, Your Honor. And I may not take them if the court doesn't have any questions for me. But I do want to make a couple of quick points. The first is, and I want to direct Judge Loyer, I want to direct you to their brief to the district court. This is JA 318, page nine of their brief. This is what they point to when they said that they told Judge Stanton not to consider the Madison Memory Study. 318? 318. They said, second, defendants object to the complaints discussion of their clinical study, the Madison Memory Study. That's the only time they reference our use of the synopsis to refer to the study. And then they have a footnote, to the extent defendants are arguing that their study necessarily constitutes adequate substantiation, we're legally incorrect. They never tell Judge Stanton not to consider what we submitted. They never made any argument. They never mentioned the NIH study in their brief to the district court at all. And so when Mr. Grossman resumes his time- But they do say the defendants are asking the court to make factual determinations as to the validity of the analysis at the pleading stage, before the commencement of fact or expert discovery, without the benefit of any expert testimony. Doesn't that suggest that they have more to say? But they, first of all, they never said don't, they never objected to our use of the synopsis. The synopsis is the only document that exists that summarizes the data. They've got the raw data. They could have argued again. I mean, they're not contesting that there's, this is an important point, I think they're not contesting- Are you saying that they forfeited this argument? Absolutely. Your Honor, if they're going to complain that Judge Stanton somehow failed to convert this, you would have expected them to object to his consideration of the evidence below. They never did. And so when, I want to make sure I answer both questions here, but we were not asking him to make factual findings about the evidence in the Madison Memory Study. They weren't disputing any of it. They're not contending that the study had a bad methodology. They're not contending that the data's wrong. They're arguing that because we engaged in subgroup analysis, it's inherently unreliable. But they're not contesting anything that's in that synopsis. But, and then with regard, when Mr. Grossman stands up again, I would ask him the following. One, if you were in a hurry because you're thinking that we're out there deceiving consumers, why did you never move for an injunction? Why have you never sought an injunction? Because they can't meet the standard. Number two, did you actually tell Judge Stanton that he can't consider any of this evidence? Did you argue against the NIH study? Did you argue against the Madison Memory Study? The answer to that is no. And the third is, if you have more to say, because they have a lot more in their briefs to this court than they pleaded to Judge Stanton, why can't you amend? And the answer to why can't they amend is, they don't have their own commission support for this lawsuit. This was voted out in the waning days of the last administration by the two Democratic commissioners left standing. They would need to go back to the commission for an amendment, and they can't. And so here we are, they rush to this court with an appeal suggesting that Judge Stanton got this wrong when Judge Stanton knows how to read a motion to dismiss. I mean, for heaven's sake. And Judge Stanton got this exactly right, looking at their complaint and saying, if you've got something to say about subgroup analysis, you've got to say it better than this. I just want to say before you sit down that I think the political party of the members of the commission have nothing to do with whether Prevagen improves memory or not. I'm not saying they do. I resent you suggesting that it's politically determined. Thank you. Mr. Grossman. Thank you, your honors. I have a few points I want to address. And the first, and this is a starting point in any advertising case. We have to look at what Quincy actually said to consumers. In their infomercial, on page 164 of the joint appendix, it says, no matter our levels of health, the key is that the vast majority of people get better very quickly. That's not a claim that only the members of the zero to two subgroups saw improved memory. That's a claim that the majority of people who take Prevagen saw improved memory. Which is not true. Not true. And I'd also direct the court's attention to paragraph 30 of the complaint. Because Mr. Jacobson likes to say that the complaint lacks substantive allegations. Paragraph 30 of the complaint features a chart showing what it purports to be precipitous improvement in memory for the general population, right? And this chart, if you look at it, it has days eight, 30, and 90. Conspicuously absent from this chart is day 60. And the reason for that is that at day 60, people taking Prevagen were actually doing worse than placebo. Moreover, the people in this advertisement depicts improvement as if it were for the general population. There's nothing here about zero to two subgroups. There's nothing here even specifying mild memory loss. But what's more, your honors, the question in an advertising case is the court has to match the advertising claims with the science stated in support. And it's not just the science that's stated in support that's a question of fact. It's also how a court is going to construe the advertising claims and how the court is going to construe the intended audience of these ads. Mr. Jacobson used the synopsis in order to establish that the relevant population is only the people in their subgroups. That's a convenient assertion, which appears not to be matched by the advertisements that this court can review on their face. I'd like to next talk about the synopsis very quickly. The synopsis is not the study. The synopsis does not contain the results of the study, bless your honor. It contains no analysis of the- Did you object to the use of the synopsis? What we objected to was the court's consideration of weighing any evidence, and we did that. Any extrinsic evidence. And that subsumes- Excuse me, your complaint refers to the study though, right? We don't refer to the synopsis. You refer to, so what do you refer to when you refer to the study? We refer to- Is there another publication somewhere of those results? Your honor, when a clinical trial fails of this nature, it's exceedingly rare for it to be published in a reputable peer reviewed journal. So what we referred to is we conducted a pre-complaint investigation, and we obtained underlying data. We obtained clinical trial protocols, and we obtained contemporaneous write-ups of the study. Not a document prepared six years after the fact on the eve of litigation. We relied on the material that Quincy relied on when it performed the study. But I can't stress this enough. This document that Quincy continuously refers to as the study, it's not the study. It doesn't contain any analysis of the results of the study the same way it does its chosen subjects. That's the implication of calling it a synopsis, but there's an underlying study. Right, but it's not even authentically a synopsis if it doesn't summarize the actual results of the study. The only thing it says about the study is in one sentence, where it concedes the study unambiguously failed. Is there a document that you relied on, or did you just, you gathered the data kind of piecemeal? We gathered it piecemeal, as we do in every case, through administrative civil investigative demands. And that's how we constructed what the study is. But when we refer in our brief below to the Madison Memory Study, we're not conceding that that document was the Madison Memory Study. We're referring to what Quincy said in its ads was the Madison Memory Study. Quincy used the term Madison Memory Study in its ads, which were released years before Quincy prepared that document that it submitted to the district court for the purpose of controverting the inferences of our complaint. What's your comment on the canine studies and the blood-brain barrier? I have several comments, Your Honor. First, Quincy is disclaiming making a representation that the protein crosses the blood-brain barrier in humans. That's a question of fact. But that representation about the dog study, it appears on a website that's trying to sell Prevagen to humans and only humans. Why would- But it appears to specifically refer to the fact that these were- I mean, they don't try to sell- Animal studies. Of course, Your Honor. But it's a question of fact as to whether or not Quincy is describing those animal studies in an attempt to get human beings to buy the product and thinking that they can draw an inference that the product will, in fact, work for them. Well, look, if I see an ad that tells me that it's based on an animal study, that's going to make me think twice. But maybe not. I don't know. Well, well- At least I know that it's based on an animal study. Well, the law- There's no further representation that it's based on a human study. As we also pointed out in our brief, the court had two things. The court had no canine studies before it. And second, the FTC will dispute at trial whether the canine studies even showed that the product crossed the blood-brain barrier in canines. That isn't true. Where is that- Is that an allegation in the complaint? No, the allegation in the complaint doesn't refer to canine studies, which is further evidence that it was inappropriate for the judge below to even talk about what's conflicted by canine studies. The complaint doesn't make allegations about that. The complaint says that in other research Quincy conducted, it learned that the protein doesn't cross the blood-brain barrier in humans. So to the- You're telling me that you would be in a position to amend your complaint to add the further allegation that it doesn't even do that for canines. We only need to plead enough facts to make the claim plausible. And here the court was required to accept as true that not only did Quincy lack evidence that the product crosses the blood-brain barrier in humans, but it knew from its own safety studies that the product cannot get to the brain. It knew from its own safety studies that the only theory that Quincy ever articulated for how Prevagen could possibly work is not true, and the court was required to grant that inference in our favor. Not only for that being allegedly a misrepresentation in its own right, but it creates a cloud over all of Quincy's representations about whether Prevagen can improve memory. So, unless the court has any further questions, I'm more than happy just to ask the court to reverse in order to have, so this case can be fully tried with expert testimony. Thank you. New York has one minute of rebuttal left. Thank you, your honors. Two brief points. First, Judge Goyer, in response to your point about the blood-brain barrier and whether the disclosure of canine studies would convince someone or suggest maybe that they shouldn't buy the product or cause them some skepticism. What the court is looking at under the FTC Act is the net impression of the ad and the disclosure of the canine studies, as alleged in the complaint, is in a single piece of website material. But it's nowhere else accompanying statements such as on the packaging itself that apricorn supplements proteins we lose as we age, or in the TV ad that- It's supposed to look at the total mix of information that's available to the consumer. That's right, it's net impression here, but something akin to total mix that might be for materiality under the securities laws, right? It's- Securities law person. Precisely, your honor. And the second point I wanted to make is that even if the court thinks that our arguments below did not preserve the argument about consideration of extra record evidence, and we think that they do, we do cite the Ford case from this court in our amended reply brief at page 11, note five, that says that the arguments to this court need not be identical to those presented below. So even if our broader argument that the court should not consider any extra complaint evidence at all, if this court considers too broad to capture the attack on the synopsis specifically, this court should not consider that argument to be forfeited. Thank you. Thank you, your honors. Thank you all, we'll reserve decision. The rest of the calendar is on submission, so I will ask the clerk to adjourn court. Court is adjourned.